# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            Plaintiff,<br>vs.<br><br>ROBERT F. KANE, a.k.a.<br>Commander Kane, and SECURITY<br>AVIATION, INC.,<br><br>            Defendants. | **3-06-cr-00022-JWS-JDR**<br><br>**RECOMMENDATION<br>REGARDING<br>DEFENDANT KANE'S MOTION TO<br>SUPPRESS**<br><br>(Docket Entry 66) |

        Defendant Robert Kane moves to suppress evidence seized from his

residence and vehicle on February 2, 2006.  Docket entry 66.  The United States

filed an opposition to the motion.  Docket entry 105.[1]  An evidentiary hearing was

---

[1]  The opposition is styled "United States's Opposition to Defendant's Security Aviation,
Inc. Motion to Suppress Fruits of Searches of Premises at 6212 Magnaview Drive, Eagle River,
AK, and One Black Chevy Tahoe Registered to Regional Protective Services, Alaska License
Plate ESS 580."  The opposition is deemed to oppose defendant Kane's motion to suppress at
docket entry 66.

conducted on April 19, 2006 addressing the consent to search the residence provided by Robert Kane and his wife, Karen Kane, and the alleged taint of the search warrant to the vehicle. Upon due consideration of the evidence adduced and arguments of counsel, the magistrate judge recommends that the court deny the motion to suppress based upon the findings of fact and conclusions of law set forth below. The motion to suppress also argues that the search warrants for the residence (3:06-mj-019-JDR) and vehicle (3:06-mj-021-JDR) are tainted due to material omissions and misrepresentations by the affiant, that the search of the residence exceeded the scope of the related warrant and constituted a general rummaging and seizure of Kane's private property. The parties filed supplemental memoranda at docket entries 157 and 172 (government) and 163 (Kane's brief). These issues are addressed below.

### Findings of Fact

On February 2, 2006, officers arrived at the residence of Robert F. Kane, defendant herein, at 6212 Magnaview Drive, Eagle River, to execute an arrest warrant for Mr. Kane. That same morning, other officers were executing search warrants at a C Street office building and two hangars. About 6:30 a.m. John Eckstein, Special Agent FBI and a member of the violent crime squad, arrived at the Kane residence. Mr. Kane had just been placed in custody with his hands cuffed behind him and was seated in the garage. The garage door was open. Agent

Eckstein met with Officer Mark Van Balen who informed him that Kane would be transported in an Anchorage police vehicle to the FBI office.  No search of the residence had commenced.  The officers moved Kane inside the residence where it was warmer.

About 7:35 to 7:40 a.m. Agent Eckstein introduced himself to Kane.  He asked Kane for consent to search the house.  As Kane walked through the garage to the police vehicle, agent Eckstein asked him if he would consent to the search of his house.  Kane asked what they would be searching for.  Agent Eckstein indicated it was illegal weapons and evidence of illegal activity.  He responded that he had "nothing to hide."  Kane remarked that even if he said no, the agents would probably get a search warrant, anyway.  Agent Eckstein replied that was a possibility.  The agent asked Kane where his weapons were, and Kane indicated in his bedroom.

Mr. Kane asked if the officers could take him inside so that he could talk to his wife and let her know that he was giving his consent to search the house.  Mr. Kane asked if his children could be moved to a separate place in the house, away from viewing him in handcuffs.  After that occurred, Mr. Kane was allowed to speak to his wife.  Agent Eckstein was present when Mr. Kane spoke with his wife, Karen Kane.  Mr. Kane told his wife that he had given police permission to search his house.  In conversation with his wife, Kane did not refer to the consent as being limited.  There is no evidence that Kane told his wife not to answer any questions.

Agent Eckstein carried a weapon which was holstered and covered by his jacket. Members of the swat team nearby were dressed in Kevlar vests that bore FBI markings, and they carried weapons. Mr. Kane expressed concern about why he had been arrested. He was told that he would be fully informed about the charges at the FBI building.

There is no evidence that anyone threatened Robert Kane in any way to solicit his consent to search. Kane had not been given <u>Miranda</u> warnings before the consent to search was solicited. There is no evidence that Kane ever attempted to revoke, modify, or limit the scope of his consent. Agent Eckstein asked him only for consent to search the residence, not the vehicle. Agent Eckstein surmised from Kane's response about the officers' potentially getting a search warrant that Kane knew that he could refuse to consent to the search of the residence. Therefore, Agent Eckstein did not specifically tell Kane that he had the right to refuse to consent. Kane was not asked to sign a consent form.

Officer O'Connell reviewed a consent form for the residence with Karen Kane while she sat in the kitchen. The officer explained to Mrs. Kane that she had already given an oral consent but the consent form would document her consent in writing. She read the consent form aloud and asked Mrs. Kane if she had any questions about it. She said she did not. Mrs. Kane signed the consent form about

8:30 - 9:00 a.m.  At no time did Mrs. Kane attempt to revoke, modify, or limit the consent for the residence.

The consent to search form, exh. 4, contains the following information: "(1) I have been asked by special agents of the Federal Bureau of Investigation to permit a complete search of: (then by hand script) my residence, 6212 Magnaview Drive, Eagle River, Alaska.  (2) I have been advised of my right to refuse consent. (3) I give this permission voluntarily.  (4) I authorize these agents to take any items which they determine may be related to their investigation."[2]  There is no evidence that Mrs. Kane, a resident alien, was threatened with deportation or that something might happen to her children if she did not consent to a search of her residence. There was no mention of a possible search warrant for the house if she did not consent.  During the day Mrs. Kane received telephone calls which the officers allowed her to take.  Karen Kane was not arrested or placed in custody that day.

A four-door black SUV Tahoe with a hatchback and police-type lights mounted inside the vehicle was parked at the residence.  Officer O'Connell had noticed the weapons in the back of the vehicle after shining her flashlight through the window.  The weapons posed a potential safety concern, and Officer O'Connell

---

[2] The exhibits at the evidentiary hearing are, for the most part, attached as exhibits to the government's opposition, although bearing different exhibit numbers in the government's document.

asked Karen Kane for consent to search the vehicle.  Mrs. Kane provided keys to the vehicle to Officer O'Connell after giving her consent to search the vehicle.

The weapons, as well as a laptop computer, were visible through the windows of the vehicle where it was parked in the driveway.  When Agent Eckstein saw the swat team looking into the back of the black Tahoe with the hatchback door up, he told Agent O'Connell that he did not believe that Mrs. Kane had authority to consent to a search of the vehicle.  It was Agent Eckstein's understanding that the Tahoe was used only by Robert Kane.  Mrs. Kane did not have a driver's license although it is unclear whether Agent Eckstein knew that at the time. Agents O'Connell and Eckstein asked Karen Kane and  if she had access to the vehicle and if she ever drove it.  She indicated that she never drove it although she had known where the keys were located.  Officers had already removed several weapons from the back of the vehicle.  The weapons  were restored and further search of the vehicle ceased until the officers obtained a search warrant for the vehicle.

Agent Eckstein observed a computer mounted on the dash on the front passenger's side of the Tahoe.  This was before the search warrant was obtained for the vehicle.  He also saw weapons in the vehicle in plain view.  His observations did not depend upon the officers acting on the oral consent to search the vehicle prior to the agent directing them to cease their search of the vehicle.

I conclude from the evidence that the officers sought a search warrant for the residence as a backup to the consent to search the residence. The search warrant also sought authority to search the residence for computers. Search warrant 3:06-mj-019-JDR was issued for the residence on February 2, 2006, at 8:23 p.m. A separate search warrant, 3:06-mj-021-JDR, issued for the Tahoe motor vehicle on February 2, 2006, at 9:13 p.m.

Periodically during the day, Agent Eckstein told Karen Kane that the officers were there only by her willingness, and that they could leave if she asked them to. By this time, the swat team had already left the premises, leaving the search team there. She did not ask the officers to leave, nor object to the removal of any property.

Stephanie Vetter, an agent with ICE, formerly INS, participated in the investigation on February 2, 2006. Her primary role was to investigate the possibility of an illegal alien in the house. Based on information received from other officers in the investigation, she ran a computer check on Maria Karen Gamalinda Kane, a person of Filipino descent. This check indicated that Mrs. Kane had been admitted as a non-immigrant visitor. The computer showed no follow-up as to her status in the United States. This led Agent Vetter to suspect that she might have over-stayed her non-immigration status.

When Agent Vetter arrived at the residence, Robert Kane was already in custody awaiting transportation to the FBI building. She waited with another agent outside and entered the residence after Mr. Kane had been placed in the APD vehicle. She saw Officer Mark Van Balen and then sought out Mrs. Kane in the residence. She identified herself to Karen Kane and showed Mrs. Kane her credentials. She told Karen Kane she was going to ask questions about her immigration status in the United States and asked her if she had any documents to show her status in this country. Mrs. Kane responded that her husband took care of that, and she had no documents.

The Kane's three children were playing in a room nearby. Agent Vetter sensed that Karen Kane was hesitant to speak with her in the proximity of her children. An agent remarked that Mrs. Kane might be more comfortable if the children were not present. Karen Kane agreed. Agent Vetter helped Mrs. Kane dress the children to go outside, and the children were picked up by Mr. Avery about 10 to 15 minutes later.

Mrs. Kane and agent Vetter proceeded to the kitchen. Mrs. Kane was not under arrest. She told Mrs. Kane why she was there and gave her no advisement of Miranda rights. Agent Vetter determined that Mrs. Kane had no driver's license but she did have a Philippine passport. The agent talked to her about her relationship with her husband, where they lived and where they were

married.  Vetter asked Karen Kane questions about her marital status to probe for a potential marriage fraud.  She told Karen Kane that she was potentially in the United States illegally.  Karen Kane stated that she thought her husband was filing proper papers for her to obtain legal status in the United States.  She could provide no time frame for such documentation.  Mrs. Kane appeared cooperative and comfortable as she spoke to Agent Vetter.  The agent told her she could not find any petition for her on file.  Mrs. Kane then became upset and appeared surprised.  Agent Vetter explained to her the consequences if she did not have proper documentation and told her that her computer system might not be current.  Agent Vetter promised to follow through with questions to Mr. Kane.

Agent Vetter was with Karen Kane when Officer O'Connell presented Mrs. Kane with the consent form to sign.  About that time, Agent Vetter's cell phone rang, and she left to answer the phone.  There is no evidence that Agent Vetter used her investigation as a lever to solicit Karen Kane's cooperation with law enforcement.  Karen Kane spoke English perfectly, and she asked appropriate questions during the dialogue about her immigration status.  Although it was early in the morning, Karen Kane was fully dressed.  Agent Vetter wore street clothes, not a police uniform.

**Discussion**

1.  Consent Searches

The defendant challenges the validity of the consent to search the residence given by him and his wife.  He challenges also the searches of his residence and vehicle on February 2, 2006.  As the defendant argues, the validity of the search of the residence depends upon the validity of the consent provided by the Kanes.  The residence was searched by consent prior to the issuance of a search warrant.  Nevertheless, the defendant argues that items seized after execution of the search warrant for the residence exceeded the scope of the warrant.

Whether a consent to search was voluntarily given is determined "from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  The government bears the burden of proving that the consent was freely and voluntarily given.  Bumper v. North Carolina, 391 U.S. 543, 548 (1968); United States v. Shan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997).  The government must show that there is no duress or coercion, expressed or implied, and the consent must be "unequivocal and specific" and "freely and intelligently given." United States v. Page, 302 F.2d 81, 83-84 (9th Cir. 1962).  Courts indulge every reasonable presumption against the waiver of a fundamental constitutional right.  *Id.*  Thus,

existence of a consent to a search is not lightly inferred.  <u>United States v. Impink</u>, 729 F.2d 1228, 1232 (9th Cir. 1984).

In <u>United States v. Jones</u>, 286 F.3d 1146, 1150 (9th Cir. 2002), the Ninth Circuit identified five factors to be considered in determining the voluntariness of a consent to a search.  These factors include the following: (1) whether a defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether <u>Miranda</u> warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.  <u>Jones</u>, 286 F.3d at 1150.  Considering the <u>Jones</u> factors, I conclude that Robert Kane voluntarily consented to a search of his residence.  He was not threatened in any way to provide his consent.  He had reasonable opportunity to change his mind before being taken from the residence, but he chose to tell his wife that he had given his consent to the agents.  Although the absence of <u>Miranda</u> warnings is a factor to consider, <u>Miranda</u> applies to custodial interrogation, not solicitation of a consent.  Robert Kane wondered aloud about the alternative of not consenting and the agents applying for a search warrant.  He was not threatened with a search warrant if he did not voluntarily consent.

Considering these (the <u>Jones</u>) factors, I conclude that Karen Kane was not in custody and therefore <u>Miranda</u> warnings need not have been given to her. There is no evidence that any officer had a gun drawn, or that she was threatened

in any way with force or violence to cause her to consent.  There is no evidence that she was told that a search warrant could be obtained, or that she was threatened in any way to consent because of the possibility of a search warrant issuing.  She was not threatened with deportation if she did not cooperate.  She was given an opportunity to confer with her husband freely about the matter of providing consent to search.  She was not threatened with any action against her children, and the children were taken care of to her satisfaction.

In anticipation of <u>Georgia v. Randolph</u>, 126 S.Ct. 1515 (2006), the government sought the authority of both of the adult Kanes before relying upon a consent to search the residence.  Neither Robert Kane nor his wife equivocated about providing consent, nor did they place any restraints or limitations on the consent they freely provided.  Mrs. Kane understood English "perfectly," thus sufficiently to understand what was being asked of her and to provide an intelligent response when she agreed to consent.  Mr. Kane's gratuitous remark about the officer being able to apply for a search warrant if he did not consent, under the circumstances, did not constitute an equivocation or reluctance to provide a consent.  Although there were many law enforcement officers present at the scene, they were not surrounding Mr. Kane or threatening him in any way when he was asked to provide a consent.  No officer had a gun drawn or pointed at Mr. Kane and most of the agents were elsewhere than in Mr. Kane's immediate presence when the

consent was sought by Agent Eckstein.  Mr. Kane was not limited in the manner in which he chose to inform his wife about the consent.  I conclude that the consent to search given by the Kanes was valid.

The defendant argues that the consent search is invalid because it lacked the specificity or particularity of a search warrant in describing the items to be searched.  The consent to search was essentially an agreement between the parties.  No ambiguity was created, and neither Mr. or Mrs. Kane asked for more specificity.  From the evidence, I conclude that Robert Kane did not expect the consent he provided to be limited, except to a search for evidence of criminal activity including illegal weapons.

With respect to the search of the Tahoe, the defendant argues that the initial opening of the hatchback of the vehicle and handling of several weapons taints the entire search.  I disagree.  First, the officers were acting upon what purported to be a valid consent provided by Karen Kane.  There is no evidence that the officers who opened the hatchback had any reason to believe that the consent was not validly given by Karen Kane.  There is no reason to believe that they knew what Agent Eckstein knew about the registered owner of the vehicle and the likelihood that it was not used by Mrs. Kane.  None of the information learned by the officers when they opened the hatchback was used for the probable cause in the affidavit for the search warrant.  Both the laptop and the firearms could be seen through the

window of the vehicle and their observations did not depend upon any search actually done by the officers.

### 2. Sufficiency of the Warrant

Kane argues that the affidavit in support of the two search warrants lacked probable cause.  In order for a search warrant to issue, there must be a fair probability that contraband or evidence of criminal activity will be found in the place to be searched.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Probable cause must exist to seize all items of a particular type described in the warrant.  United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986).

The search warrant for 6212 Magnaview Drive in Eagle River was issued based upon the affidavit of Special Agent Matthew Campe in case no. 3:06-mj-019-JDR.  The same affidavit was part of the application for the vehicle in case no. 3:06-mj-021-JDR.  The fifty-four page affidavit sought evidence of the following crimes:    possession and importation of an unregistered destructive device, conspiracy to possess an unregistered destructive device, unlawful importation of a firearm, conspiracy to unlawfully import a firearm, conspiracy to commit bank fraud, bank fraud, conspiracy to make false statements to a financial institution, making false statements to a financial institution, and wire fraud.  The pertinent federal code provisions were recited in the application and warrant.

The affidavit described the subjects of the investigation as including Mark J. Avery, Robert F. Kane, Dennis Love Hopper, Security Aviation, Inc. The investigation included the unlawful importation, purchase, possession, and conspiracy to purchase and possess at least one prohibited rocket pod/launcher assembly designed to be mounted on a military-type jet and in the possession of Security Aviation, Inc., and Regional Protective Services. The investigation included alleged false statements made by Mark Avery and Security Aviation to obtain a $500,000 line of credit from an Anchorage bank insured by the Federal Deposit Insurance Corporation. The affidavit referred to a review of trust documents indicating that Avery was a trustee responsible for the management of the May and Stanley Smith charitable trust, and the investigation sought to determine if any of the trust funds had been diverted to purchase or import contraband to Alaska, including rocket pod/launchers. The affidavit described that Avery, using an address of 3230 C Street, had applied for FAA registration for at least six Albatross L-39/59 jets. The affidavit described Robert F. Kane as a partner of Avery and stated that until mid-2005 Kane had been listed as an informant in a Tampa, Florida, FBI field office. The affidavit set forth various claims informants attributed to Kane. Kane claimed to have certain contracts and connections, including government contracts, which the FBI's investigation indicated did not exist. Kane claimed to have stated that he was worth $660 million that he had inherited from a presidential advisor the previous year.

Kane was associated with case investigations involving financial fraud. ¶18 of the warrant affidavit. One witness observed Kane firing several rockets from a hand-held rocket launcher at Kane's residence in Oregon. The affidavit described Dennis Hopper as a person who had claimed to a civilian witness that he had an international market for weapons. The affidavit described the company holdings of Security Aviation and personal property such as airplanes valued in the millions of dollars.

According to one witness, Kane had informed the individual that the purpose of the purchase of the L-39/59s was for covert military contracts overseas for Security Aviation, Inc. According to one witness Kane was overheard stating that "he kills people for a living." According to other witnesses, Kane claimed to have certain military medals which could not be documented.

The affidavit described the purchase and possession of rocket pods for the Albatross aircraft. The affidavit set forth that rocket pod/launchers are prohibited destructive devices under federal law, and possession of an unregistered destructive device violates federal law. A search of ATF records found no registration of any rocket pod/launchers in Alaska. The affidavit set forth information from a former aircraft mechanic employed by Security Aviation that Security Aviation had possession of a rocket pod/launcher at the Palmer, Alaska, hangar leased by Security Aviation. A witness observed the rocket pod/launcher stored on Security

Aviation property.  A second rocket pod/launcher was also observed by an informing witness.  The affiant received information from a witness that an administrator for Security Aviation was engaged in research for weapons that could be mounted on the Albatross aircraft, including guns or rocket pod/launchers at the direction of Kane.  The affidavit described the authority exercised by Kane in running the operation, and describes Kane's words when one of the crates was opened that "he would be able to do target practice now."  ¶34.  The affiant verified with one of the witnesses a photograph of the type of rocket pod/launcher that he saw in the Security Aviation hangar in Palmer.  There is reference in the affidavit to the movement of the rocket pod/launchers, as well as their acquisition.  The application for the search warrant sought documentation and evidence relating to alleged unlawful importation of the firearm/destructive devices and their unlawful possession.

The affidavit describes the May and Stanley Smith charitable trust and referred to a news article indicating that Smith's widow, May Wong Smith created the foundation but was no longer a decision maker.  The affidavit described the secrecy apparently surrounding the trust and trustees, and Kane's overseas travel stating that Kane had advised U.S. Customs that he had been in Nassau, Bahamas, escorting an elderly woman from Europe to Nassau.  Kane advised one witness that he worked for "an old lady" whom he escorted around the world.

Hopper claimed to be working for a company headquartered at 3230 C Street and claimed that in recent months he had been in several different foreign countries. Hopper's supervisor in Alaska was Robert Kane. Hopper indicated that the company was going to train Afghan or Iraqi security forces in Alaska within the next few weeks. Hopper indicated that he could answer no further questions and asked the witness to talk to Kane.

The Anchorage FBI had no prior knowledge of Kane or any of his activities at that time. One of the witnesses had been advised by a long-term local law enforcement officer to stop putting his nose where it did not belong. The affidavit described alleged false statements in loan documents that indicated the purpose of the credit approval presentation was for a new $500,000 line of credit to pay off a temporary non-revolving line of the same amount. The documentation indicated that the borrower (Security Aviation, Inc.) had significant growth attributed primarily to a large $30 million Department of Defense contract. The affiant indicated that federal investigators were unable to locate any such DOD contracts. The affiant reviewed and analyzed records of several bank accounts used by the subjects that the affiant concluded showed suspicious banking activity. The affidavit described such activity and implicated Robert Kane.

The affidavit indicated that Kane and Avery advised the witnesses that they required extraordinary computer and communications security including CIA-

grade encryption to protect the trust and their companies from unspecified outsiders. The affidavit discussed how Avery and Kane kept their money outside Alaska and claimed to have contacted FBI prior to performing massive international wire transfers, but no indication of any current contact with the FBI could be located. The affidavit described international banking and the use of secure computer network(s) accessible only to Avery and Kane. Two of the witnesses indicated that Kane and Avery utilized laptop computers installed on vehicles. ¶70. The affidavit set forth the technique and process used by the FBI to analyze computer systems.

Paragraph 72 of the affidavit stated that Kane had been arrested and taken into custody on February 2, 2006. An AT&F agent determined that there were no silencers or firearms registered to Robert Kane. The affidavit indicated that a consent search of the residence of Robert Kane had occurred and described some of the items found. *See*, ¶74, *et seq.* This included a discussion about a suspected silencer that is a prohibited firearm under 26 U.S.C. §5845(a)(7) and §5861(d). The affidavit included an interview with Kane's spouse, Karen Gamalinda. This included information about his use of computers. The affidavit concluded that Kane was masquerading as a law enforcement officer or military veteran. The affidavit in case no. 3:06-mj-019-JDR essentially sought a warrant to conduct a more extensive search of the residence as a followup to the consent search. Kane argues that Campe's affidavit offers little probability that he was involved in either possession of

an unregistered destructive device or financial fraud.  The test is whether there is a "fair probability" that evidence of the stated criminal activity will be found in the place to be searched.  Illinois v. Gates, at 238.  The affidavit need not establish the residential owner's criminal liability for the crimes under investigation.  Because the affidavit described Kane's involvement with the rocket pods at Security Aviation, the fact that the rocket pods themselves were observed at the Palmer hangar does not mean that evidence of the related offense could not be found at Kane's residence or in his vehicle.  Similarly, the fact that Kane's name is not on documents of ownership of Security Aviation or its affiliates does not mean that evidence of the suspected financial or wire fraud associated with the trust could not be located at Kane's residence in light of his position at Security Aviation and evidence of high financial spending.

### 3.  Scope of the Warrant

A search pursuant to a warrant is limited by the extent of the probable cause.  United States v. Whitney, 633 F.2d 902, 907 (9th Cri. 1980).  "The command to search can never include more than is covered by the showing of probable cause to search."  United States v. Hinton, 219 F.2d 324, 325 (7th Cir. 1955), *cert. denied,* 450 U.S. 1004 (1981).  Probable cause must exist to seize all the items of a particular type described in the warrant.  United States v. Spilotro, 800 F.2d at 963.

This particularity requirement prevents a "general, exploratory rummaging in a person's belongings." Andresen v. Maryland, 427 U.S. 463, 480 (1976).

Kane argues that the affidavits for these two search warrants do not establish probable cause that wire fraud occurred. Probable cause exists when there is a fair probability or a substantial chance of criminal activity. Illinois v. Gates, 462 U.S. 213, 235 (1983). The determination of probable cause is based upon the totality of the circumstances described in the warrant application. Under Gates, the relevant inquiry is whether in light of all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. There is no requirement that a search warrant application set forth proof of all of the material elements of the offense under investigation. Such would be the case if the probable cause addressed the sufficiency of a criminal complaint.

The government argues that the search warrant applications establish probable cause to suspect that Mark Avery, Robert Kane, and Security Aviation committed wire fraud with respect to the May and Stanley Smith Charitable Trust. According to the affidavits of Special Agent Matthew Campe this trust was designed only to fund non-charitable purchases and is a suspected source of a $50 million "loan" (via wire transfers) which was used by Kane and Avery to purchase non-charitable items including boats, aircraft, homes, vehicles, and investment into

Security Aviation as well as other business ventures which were not charitable in nature.

Campe's affidavit states that two witnesses described Avery as using his business computer network at 3230 C Street to communicate, perform online banking, and to facilitate high value wire transfers. The affidavit describes the agent's investigation as including a review of trust documents, tax filings for the trust, and a determination that Mark Avery was one of three trustees responsible for the management of the May and Stanley Smith Charitable Trust, a charitable trust organized in San Francisco, California, with a stated fair market value of $350 million for the tax year 2004. The affidavit states that the purpose of the trust was to fund charitable endeavors dedicated to education and other charitable purposes.

According to the witnesses who provided information to the investigator, Avery and associates has no known legal employees and insufficient legal clients to generate the large sums of money used by Avery in his ventures. The affidavit describes searches through Motznik (computer services) and INGENS that revealed only one court filing for Avery and Associates for the years 2004 and 2005. The affidavit describes Avery's partner, Robert F. Kane, who has made claims that he worked with the FBI, DEA and CIA, whereas the government's investigation does not bear that out. According to the affidavit the Department of Defense and the State Department deny the existence of government contracts claimed by Kane.

The affidavit indicates that Kane and Avery hold themselves out as equal partners in various business ventures although investigators have not found any public record or other document indicating Kane's ownership interest in any of the property or businesses. The affidavit refers to a statement claimed to have been made by Kane to a civilian witness formerly employed with Security Aviation stating he has "more money than God." Kane reputedly stated to one government agent that "Avery is the money man."

The affidavit indicates that one witness credited Kane with stating that Kane was worth $660 million that he had inherited from a presidential advisor who had died the previous year. Agents were unable to find any public records for Kane's home, other than it was purchased by an Avery-owned company. The affidavit describes Kane's prior involvement in cases involving financial fraud and questionable loans and defrauding of funds. The affidavit describes the secrecy with which Avery and Kane have attempted to cloak themselves and their businesses.

Documents indicate that in 2004 the trust held assets valued at $357 million and distributed $7.8 million in charitable grants. After March 2004, the trust ceased filing records in California and moved out of State. It indicates that Avery received an annual salary from the trust of $400,000 for forty hours' work per week. The affidavit indicates that false statements were made in a $500,000 line-of-credit application with Wells Fargo Bank on behalf of Security Aviation and Mark Avery. For

example, the loan application included a claim that Security Aviation's growth was spurred by over $100 million in government contracts. The government claims the contracts do not exist.

The affidavit describes what the government has characterized as suspicious banking activity on the part of Security Aviation. Investigation revealed numerous business accounts that showed "little legitimate business activity, but a great deal of wire transfer and electronic (computerized on-line) banking transfer activity into and out of the accounts by Avery, his wife, and his employees at Security Aviation."

The affidavit indicates that Avery is believed to have created a shell company(s) with no known business activities based on a review of records of the Alaska Department of Commerce Corporation. Deposits into one Security Aviation account for the period of September 2005 through October 2005 totaled $7.3 million. Kane and Avery reputedly advised the two witnesses that they required extraordinary computer and communication security, including CIA-grade encryption, to protect their companies from outsiders who could scrutinize multi-million dollar international wire transfers by Avery and Kane.

The purpose of a search warrant is to obtain evidence that probably relates to a crime. It is not the purpose of the warrant to prove beyond a reasonable doubt that the crime has occurred. Probable cause exists when there is a fair

probability or a substantial chance of criminal activity.  <u>Gates</u>, 462 U.S. at 235. Section 1343 of Title 18 provides in relevant part that "whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, . . . or sounds for the purpose of executing such scheme or artifice" violates the law.

      The affidavits contain sufficient sworn statements that probable cause exists to believe that wire fraud has been committed and that items related to that offense, such as the fruits of the crime, will be found on the premises sought to be searched at the time the warrant is issued.

      Kane argues that the warrant affidavit does not contain probable cause for seizure of categories of items specified in paragraphs 4-11 of attachment B. Briefly stated, those paragraphs describe items to be seized including records relating to contracts with the United States and other government agencies relating to Security Aviation, Inc. and its described affiliates; records relating to described topics such as military training, anti-terrorism training, and witness transport; records relating to accounts receivable of Security Aviation for contract work with foreign governments; records relating to soliciting or acquiring government or private contracts for air services; records relating to the employment of Robert F. Kane for

the years 2004 to present; computer and electronic data relating to the aforementioned categories; records relating to trust and trust agreements of May & Stanley Smith charitable trust; and bank records relating to the trust concerning the care of an elderly woman.  The Campe affidavit describes the character of Robert Kane as a person claiming to have achieved certain accomplishments that the government believed to be false.  His boasting included transporting detainees for the U.S. government from overseas locations through his work with Regional Protective Services and Security Aviation.  Based on information from confidential informants Kane claimed the existence of certain contracts with the U.S. and foreign governments that the affiant did not believe existed.  These boasts were related to the alleged illegal possession and importation of a firearm or destructive device, conspiracy to commit bank fraud and wire fraud relating to the trust.  The affidavit describes a large amount of monies and assets attributed to Kane but suspected to have been derived illegally from the trust.  The affidavit expresses concern about the intended use of rocket pods by Kane and Security Aviation.  The portion of the affidavit addressing the May & Stanley Smith charitable trust implicates Kane directly. *See, i.e.*, ¶¶ 45 & 46, the latter of which refers to Kane working for "an old lady" whom Kane allegedly had escorted around the world.

The affidavit talks about (unindicted)  Dennis Hopper, an individual associated with Security Aviation, and Hopper's claim to have been training foreign

security forces in Alaska.  Hopper's Alaska supervisor was Robert Kane.  The affidavit describes Kane as a person who one would expect to have documentation relating to foreign travel and foreign contacts in light of the described activities of Kane, as well as boasts attributed to Kane by various informers.  With respect to the $500,000 revolving line-of-credit sought by Security Aviation, the affidavit describes an alleged false representation by Mark Avery or Security Aviation relating to Department of Defense contracts in existence with Security Aviation and Mark Avery.  Because of the relationship of Kane to Security Aviation and Mark Avery, it is highly plausible that Kane would have some of the evidence and records sought by the search warrant relating to the alleged spurious banking activity.  The affidavit indicates that Avery and Kane held themselves out as equal partners in their business ventures.  *See*, ¶66.  Kane is implicated in the disbursements of the charitable trust.  *See, i.e.*, ¶67.  Kane was reputed to have advised the witnesses that he and Avery used extraordinary computer and communication security, including CIA-grade encryption to protect the trust and companies from unspecified outsiders "who will scrutinize multi-million dollar international wire transfers by Avery and Kane."  ¶68.  According to Avery and Kane, it was part of their business plan to purchase and expand aviation businesses in Alaska and keep their money outside the State.  ¶69.  Kane reputedly referred several times to the trust as "my trust" in the presence one of the informants.  ¶69.

The affidavit refers to the February 2, 2006, consent search of the residence of Robert Kane at 6212 Magnaview Drive, Eagle River. The affidavit describes an unregistered silencer found in the residence. The affiant states that he believes there is probable cause to believe that a .45 pistol may be at the residence to match the silencer. The affidavit describes Kane's salary, a trip taken by Robert Kane to the Bahamas with an "old lady" and describes gifts from Mark Avery to Robert Kane such as an F4U Corsair fighter plane. The affidavit indicates that there are at least four computers in the residence used almost exclusively by Robert Kane. A careful review of the affidavit reveals that the categories of items objected to do not fall outside the scope of probable cause contained in the warrant affidavit.

### 4.  Execution of Warrant

Kane argues that the search warrant returned for the residence reveals a large number of items which fall outside the items authorized to be seized under the warrant. Specifically, Kane describes an agent badge, an international driver's license, and documents regarding firearms purchase prices. Kane argues that the government engaged in a general rummaging and seizure of his private property beyond the scope of the warrant. The affidavit states in some detail the existence of false statements on loan documents relating to over $100 million in government contracts through the Department of Defense or government contracts for Medivac and training. See, ¶¶55-63 of the affidavit. The magistrate judge is satisfied that the

items seized and complained of by Kane have been explained by the government, and there has been no showing of rummaging and seizure of tangible property complained of by the defendant.  Finally, Kane speculates that the warrant was executed at the residence after 10:00 p.m. in violation of the language of the warrant. The evidence before the court does not substantiate that claim.  Most items seized were seized pursuant to the consent by Robert and Karen Kane.  As the search team was still present at the site, the agents did not need much additional time to act upon the warrant for the additional items sought.

5.  Alleged Omissions / Misrepresentations

Kane moves to suppress all evidence seized pursuant to the two search warrants on grounds that the affidavit supporting the search warrants contains material false statements or omissions made intentionally or with reckless disregard for the truth. Kane's memorandum incorporates by reference Security Aviation's request for an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 152 (1978).[3]

A <u>Franks</u> hearing is required when the defendant makes a preliminary showing that the affidavit contained intentionally or recklessly false statements or misleading omissions, and the affidavit cannot support a finding of probable cause without the alleged false information.  <u>Franks</u>, 438 U.S. at 171-72; <u>United States v.</u>

---

[3]  Security Aviation's request is filed at docket entry 76.

Reeves, 210 F.3d 1041, 1044 (9th Cir. 2000).  The burden is on the defendant to prove a Franks violation by a preponderance of the evidence.  United States v. Dozier, 844 F.2d 701, 705 (9th Cir. 1988).  Mere negligence or inadvertence does not constitute a Franks violation.  Id.; United States v. Collins, 61 F.3d 1379, 1384 (9th Cir. 1995).  The preliminary showing to obtain a Franks hearing has been outlined by the Supreme Court opinion.  In Franks, the Supreme Court stated:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by  a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.  The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any non-governmental informant.  Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

438 U.S. at 171-72.

### Alleged Misrepresentations and Omissions Regarding Bank Fraud

Security Aviation contents that the affidavit of Special Agent Matthew Campe, FBI, contains material misrepresentations and omits material information regarding the allegation of bank fraud. Security Aviation challenges Campe's statement that the ownership of Security Aviation was transferred from [Stephen J.] Kapper to Mark Avery on December 5, 2005. (Paragraph 57 of Campe's affidavit.) Security Aviation relies upon a March 24, 2006, affidavit of Mark Avery stating that he purchased 100 percent of the stock of Security Aviation on July 9, 2005, from the estate of Michael R. O'Neil. *See*, exh. C to docket entry 73.

Paragraph 57 of the affidavit states that special agent Campe reviewed Alaska Division of Corporations business and professional licensing records which indicated that 100 percent ownership of Security Aviation was transferred from Kapper to Avery on December 5, 2005. Security Aviation has not proffered any evidence to substantiate the claim that Agent Campe gave false or reckless information about the ownership of Security Aviation. Whether or not Avery was the owner of Security Aviation at the time of the loan is not significant to the finding of probable cause since Avery was at least a director and chairperson of Security Aviation at the time. Campe's affidavit states that his information came from public record, and Security Aviation has not shown that public information would have shown the transfer of ownership to Avery in July 2005. The allegation of bank fraud is not dependent upon proving that Avery was not the owner of Security Aviation at the time of the loan.

Security Aviation alleges that the affidavit contains material omissions regarding the Wells Fargo loan. The defendant faults the agent for not stating in his affidavit that he had not discussed the loan application with a loan officer who oversaw the loan. The defendant claims this is significant because had the agent spoken with Joseph J. Kocienda, Senior Relationship Manager with the main office of Wells Fargo on Northern Lights Boulevard, the agent would have learned that no one from Security Aviation represented to Wells Fargo that they had current government contracts in the millions of dollars.[4]

Paragraph 57 of the affidavit refers to an October 4, 2005, credit approval presentation listing the borrower as Security Aviation, Inc., with ownership under the name of Mark Avery, 100 percent. The affidavit quotes from a loan document stating that "growth [of Security Aviation] is attributed primarily due to a large $30MM DOD contract." In his affidavit, Kocienda explains that his statements cited by the government in paragraphs 57 and 59 of the Campe affidavit were not intended to state that Security Aviation currently had large government contracts. Kocienda explains that he intended to say that Security Aviation was negotiating for potential new contracts and was in a position to obtain them.

The standard is not what Agent Campe could have done but what he did with respect to his statements in the warrant affidavit. <u>United States v. Miller</u>, 753

---

[4] After this loan was made, Kocienda went to work for Security Aviation.

F.2d 1475, 1478 (9th Cir. 1985) ("It might have been prudent for the federal agents to check on [an informant's] background and criminal record, but their failure to do so is not reckless disregard.") Here, the failure to investigate more fully is not evidence of "reckless disregard" of the truth. As the government points out, what was in the mind of Kocienda at the time has no bearing on what the documents reflected during SA Campe's investigation. The agent was not expected to guess at what the bank officer meant to say.

### Alleged Omissions of IRS Audit of Charitable Trust

Campe's affidavit refers to the May and Stanley Smith charitable trust. Security Aviation contends that the omission of the fact that the IRS completed a full audit of the trust in December 2005 merits a <u>Franks</u> hearing. Security Aviation claims that the omission of the IRS audit was materially misleading in that it created a false impression of a trust fund that the government had no information about.

The credit approval presentation for Security Aviation's loan from Wells Fargo Bank contains "approvers" comments attributed to Joseph Kocienda as follows: "Security has acquired over $15MM in aircraft asset(s) over the past ninety days under new ownership and has acquired over $150MM in new government contracts for MedVac and training. . . ." *See*, exh. 3, p. 2 to docket entry 103. Agent Campe's information was not only that there was misrepresentation in obtaining the loan, but that there was no apparent legitimate source for the money coming into Security

Aviation other than from the trust.  Apparently Wells Fargo had similar questions in the loan application process.  It is understandable that the FBI would not attempt to interview Kocienda about the very loan that was being questioned in its investigation.

## Omission of IRS Audit

Security Aviation offers no evidence that Agent Campe was aware that the IRS had completed an audit of the trust.  In fact, the government claims he was unaware that an audit had occurred.  Even if the affidavit had disclosed that an audit had occurred, there is no showing that an audit would have addressed whether the charitable trust was being spent appropriately.

## Alleged Misrepresentations Regarding Destructive Device

Security Aviation criticizes the reference in paragraph 33a of Campe's affidavit addressing whether the rocket pod/launcher had been "de-militarized."  The defendant argues that the standard for determining whether a rocket pod is a destructive device is not de-militarization.  The search warrant sought the pods themselves.  The government was not required to establish operability of the pods prior to seeking a warrant for their seizure.  The defendant argues that the pods as they sat in the hangar did not constitute destructive devices.  Security Aviation suggests that a pod still in a crate in a storage room could not constitute a destructive device.  This ignores the ability to readily convert the items sought into a destructive device.  It was not necessary that the affidavit state that the pods were actually attached to the

aircraft.  It was not necessary that the rocket pods in fact constitute destructive devices within the meaning of the federal law so long as it was reasonable for the agent to conclude that the pods probably were destructive devices to which the law applied.

The motion to suppress claims that paragraph 33b of Campe's affidavit omitted material information when it failed to state that Witness I (Anthony) did not have actual or apparent authority to grant Witness E (Berens) and the Air USA agents access to the Palmer hangar located at 801 East Cope Industrial Way, Palmer, Alaska. The defendant states that Witness I was also aware that he did not have authority to grant access to the Palmer hangar to non-Security Aviation personnel.  From the evidence adduced at the April 20, 2006 evidentiary hearing, I conclude that Witness I (Anthony) did have apparent authority to admit Berens to the hangar, and Agent Campe did not know otherwise at the time.  Berens arranged for his entry to the hangar to retrieve fuel tanks and batteries that were part of the planes being repossessed. That Anthony may have been aware that he did not have authority to grant any non-employee entry to the Security Aviation hangar is of no moment because neither Anthony nor anyone else is alleged to have brought that fact to the attention of Agent Campe before he applied for the search warrant.

The motion does not contain evidence to indicate that Agent Campe made any material representations or omission in his statements in this regard.  Paragraph 33b states that the affiant received information from an AT&F agent that a former

aircraft mechanic employed by Security Aviation, Witness E (John Berens), had reported to the AT&F that Security Aviation possessed a rocket pod/launcher at the Palmer, Alaska, hangar leased by Security Aviation.  Witness E advised that he previously had observed the rocket pod/launcher at the hangar while employed with Security Aviation as late as December 2005.  The statement that Witness E believed a Security Aviation employee would grant access to the storage room was not a significant fact in the affidavit since the agent was seeking a search warrant which would provide the needed access to agents executing the warrants.  Agent Campe's failure to investigate the authority of witnesses to gain access to Security Aviation's hangar does not meet the *prima facie* showing needed for a <u>Franks</u> hearing on that issue.

### Alleged Omission of FAA Oversight

The moving defendant claims that the affidavit omits that the airplanes were going to be used for a peaceful purpose and relevant information regarding the FAA's oversight of Security Aviation.  The FAA's oversight is not an important fact in the determination of probable cause because such oversight does not by itself have a direct bearing upon whether there is evidence of the alleged crimes sought.  For example, just because a federal bank may be subject to oversight by the Federal Reserve Board or other government agencies does not mean that officials of that bank could not be engaged in fraudulent activities.  The fact that the aircraft are regulated

by the government detracts little from the facts supporting probable cause for the underlying investigation.

### Omissions Regarding Witnesses E and I

Security Aviation suggests that the affiant failed to disclose information relevant to the credibility or bias of the "former disgruntled" employees who provided information to Agent Campe that he used in his affidavit.  In support of this point, the defendant offers the affidavit of Evan Griffith, who is a consultant for Security Aviation. In his affidavit, Mr. Griffith characterizes certain former employees of Security Aviation as disgruntled employees.

Witness E provided information that a rocket pod was in the possession of Security Aviation after December, and that the pod was located at the Palmer hangar close in time to the issuance of the search warrant.  The question of whether Agent Campe knowingly failed to disclose his entry to the hangar is addressed in the recommendation on the docket entry 71 motion to suppress.   Agent Campe's observations in the hangar were inculpatory, not exculpatory.

The defendant faults the affiant for not stating in his affidavit why Witnesses E and I were "former" employees.  In the defendant's motion Security Aviation states that Witness E quit his employment with Security Aviation "under peculiar circumstances." There is no legal requirement that an affidavit for a search warrant characterize a former employee of the target company as "disgruntled" or

explain the circumstances of that former employee's termination with the company. There is no reason to believe Agent Campe knew the "peculiar circumstances" of Anthony's departure or disagreement with Security Aviation before presenting his search warrant affidavit.

At the April 20 hearing, it was disclosed that Anthony (Witness I) was fired because he let Berens and those persons accompanying him into the hangar and initially lied to his supervisor about what he had done.  It is undisputed that the witnesses had access to the observations they provided to law enforcement and whether or not the witness was a disgruntled employee does not materially affect the probable cause determination.  There is no showing that Agent Campe was aware of the information addressing the bias of the witnesses when he drafted his affidavit.  It was not germane to the affidavit to set forth the history of the witnesses relationship to the Security Aviation dispute with Air USA.  The details of the prior removal of aircraft by Air USA raises matters collateral to the probable cause determination for the search warrants.

Under the defendant's version, law enforcement should have conducted a collateral investigation into the relationships between the witness informants and Security Aviation, Inc., Robert Kane and Mark Avery before providing statements from those witnesses in the search warrant application.  The information from the witnesses would still have been included in the warrant affidavit even if the credibility information

relied upon by the defendant had also been set forth.  Assuming arguendo that biased material about the witnesses' relationship to Security Aviation was known to the agent and intentionally omitted, I reject the claim that the statements of Witnesses E and I (Berens and Anthony) should be excluded because more was not said in the affidavit about their past relationship with Security Aviation.  Even if the affidavit stated Witness E had been fired, this would have been only one factor in determining under the totality of circumstances whether it was probable that evidence of a crime existed at the places sought to be searched.

The defendant cites paragraph 33b in support of its claim that Agent Campe was aware that Witness E was estranged from Security Aviation.  To the extent that the paragraph may be so construed, then it follows that Agent Campe did not fail to reference the bias of Witness E in the affidavit.  The defendant claims that Agent Campe "must have known" that Witness I had been fired by Security Aviation for his participation in the  taking of the L-39 MSS aircraft.  Having been fired from employment would provide an explanation and motive for the person providing information to law enforcement concerning alleged wrong-doing by his employer, but it would not render the information unreliable in light of the corroborating information in the affidavit.  A reasonably prudent judicial officer would not have totally discounted the statements and observations reportedly made by Witnesses E and I.  Because the warrant is issued on the basis of probable cause to believe that an offense occurred

and that evidence may be located in a particular place, a law enforcement officer as well as the court may rely upon information received from informants even though it is certainly a possibility that such witness(es) may be biased in his statements. The probable cause assessment is based on the probability that the statements and observation may be correct, especially when corroborated by other witnesses and observations.

The defendant has not made a sufficient showing for a <u>Franks</u> hearing that SA Campe illegally entered the Security Aviation hangar in Palmer. This issue was sufficiently addressed at the suppression hearing on the motion to suppress, docket entry 71. Omission that SA Campe was present at the time of the repossession of aircraft claimed by Air USA was not detrimental to the issuance of the warrant. The evidence is that Agent Campe did not participate in the repossession of the airplanes on the tarmac and met Berens after the planes had been moved. *Cf.*, <u>United States v. Whitworth</u>, 856 F.2d 1268, 1281 (9th Cir. 1988). In summary, the defendant has failed to make a substantial preliminary showing that the Campe affidavit contains reckless or deliberate omissions of fact that tend to mislead, and to demonstrate that the affidavit in its modified version would not be sufficient to support a finding of probable cause. Therefore, a separate <u>Franks</u> hearing is not warranted. <u>United States v. Kyllo</u>, 37 F.3d 526, 529 (9th Cir. 1994).

For the foregoing reasons, Kane's motion to suppress evidence seized at his residence and from his vehicle lacks merit.  The motion to suppress at docket entry 66 should be denied.  IT IS SO RECOMMENDED.


DATED this 4th day of May, 2006, at Anchorage, Alaska.


  /s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **4:00 p.m., Friday, May 5, 2006**, to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.   Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **NOON, Monday, May 8, 2006**.   The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

       Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).